IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| VICTORIA TRANSCULTURAL<br>CLINICAL CENTER, VTCC, LLC<br>3541 CHAIN BRIDGE ROAD, #204<br>FAIRFAX, VIRGINIA  22030<br><br>          **Plaintiff,**<br><br>     v.<br><br>**JENNIFER S. LEE, M.D.,** IN HER OFFICIAL<br>CAPACITY AS DIRECTOR OF THE VIRGINIA<br>DEPARTMENT OF MEDICAL ASSISTANCE<br>SERVICES<br>SERVE:  JENNIFER S. LEE, M.D.<br>600 EAST BROAD STREET<br>RICHMOND, VIRGINIA 23219<br><br>And<br><br>**THE VIRGINIA DEPARTMENT OF<br>MEDICAL ASSISTANCE SERVICES**<br>SERVE:  JENNIFER S. LEE, M.D.<br>DIRECTOR OF THE VIRGINIA<br>DEPARTMENT OF MEDICAL ASSISTANCE<br>SERVICES<br><br>          **Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) Civil Case No. _____<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT FOR INJUNCTIVE RELIEF

Plaintiff Victoria Transcultural Clinical Center, VTCC, LLC ("VTCC"), by counsel, hereby files its Complaint for Injunctive Relief against Defendant Jennifer S. Lee, M.D. in her capacity as Director of the Virginia Department of Medical Assistance Services and the Virginia Department of Medical Assistance Services ("DMAS").  In support thereof Plaintiff states as follows:

## JURISDICTIONAL STATEMENT

1. Plaintiff brings this action seeking injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure.

2. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, which grants district courts original jurisdiction over all civil actions arising under the laws of the United States. This action arises under Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et. seq.* and the Fourteenth Amendment, § 1, of the United States Constitution.

3. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. §1367, which grants district courts supplemental jurisdiction over all claims that are "closely related" to claims over which they have original jurisdiction.

4. Venue is proper in the Eastern District of Virginia pursuant to 28 U.S.C. § 1391 (c), because the events giving rise to this claim occurred in this judicial district.

## PARTIES

5. VTCC is a Virginia limited liability company with its principal place of business located in Fairfax County, Virginia. VTCC is a mental and behavioral health services provider that primarily provides culturally, religiously, and linguistically competent services to the underserved racial and multicultural minorities in Northern Virginia. VTCC is licensed by the Virginia Department of Behavioral Health and Developmental Services ("DBHDS") and is a qualified provider of Medicaid services.

6. Defendant, DMAS is an agency of the Commonwealth of Virginia, and is the agency that administers the Virginia Medicaid Program.

7. Defendant, Jennifer S. Lee, M.D. is the Director of DMAS.

## INTRODUCTION

8. On June 15, 2020, The Governments of the United States of America and the Commonwealth of Virginia (collectively "the Government") filed a civil False Claims Act case against VTCC (the "FCA Litigation"). The Government did not seek injunctive relief, did not attempt to freeze assets, and did not interfere with VTCC's treatment of its clients. VTCC adamantly denies having violated the False Claims Act or any other count alleged in the FCA Litigation and intends to defend itself vigorously in the FCA Litigation.

9. By letter dated July 2, 2020, that VTCC did not receive until at least July 8, 2020, Magellan Health, Inc., DMAS' behavioral health administrator for its fee-for-service program, informed VTCC that DMAS had suspended its ability to receive Medicaid payments. A true and accurate copy of this letter is attached as **Exhibit 1**.

10. The sole explanation for DMAS' suspension of VTCC's Medicaid payments was its premature and incorrect determination that there was a "credible allegation of fraud," which presumably relates to the false allegations listed in the FCA litigation.

11. DMAS suspended VTCC's Medicaid payments before VTCC was able to dispute these allegations, seek an administrative appeal, or have a factual hearing on the merits of the allegations of fraud.

12. Magellan informed VTCC verbally, on July 8, 2020, that it would suspend its Medicaid payments pursuant to 42 C.F.R. § 455.23.

13. On July 22, 2020, well within the thirty (30) day deadline to file an appeal, VTCC filed its Notice of Appeal. A true and accurate copy of the Notice of Appeal is attached hereto as **Exhibit 2.**

14. While VTCC has good cause to continue to receive its Medicaid payments under 42 C.F.R. § 455.23 (e) or (f), and has appealed DMAS' decision; given that all of VTCC's revenue is dependent on its Medicaid payments status, an administrative appeal will take too long, and force VTCC out of business immediately.

15. Therefore, VTCC must seek declaratory and injunctive relief pursuant to Federal Rules of Civil Procedure 57 and 65 to prevent it from going out of business.

16. VTCC's demise will also drastically and negatively affect its minority, multilingual clients as they will be forced to seek new providers without special competencies in treating this underserved demographic.

17. Even if alternative providers are available, VTCC's clients are high-risk individuals with complex mental health issues, and a sudden change in treatment providers will undoubtedly put their health, safety, and well-being at risk, causing an irreparable regression in their treatment.

## STANDING

18. Given the irreparable harm that both VTCC and their at-risk clients will suffer, VTCC brings its claims on behalf of itself and on behalf of the Northern Virginia citizens receiving necessary mental health treatment from VTCC's qualified services.

## THE MEDICAID PROGRAM

19. As set forth in Title XIX of the Social Security Act, the Medicaid program is a federal and state partnership program providing medical assistance to individuals "whose income and resources are insufficient to meet the costs of necessary medical services." 42 U.S.C. § 1396-1. The statutory program authorizes the Federal Government to pay a percentage of the

costs a state incurs for medical care, as long as the state complies with certain federal requirements.

### Medicaid Equal Access and Best Interests Provisions

20. Federal law requires state Medicaid plans to employ methods and procedures to ensure that the state's payments are sufficient to enlist enough providers so that care and services are available to the general population in a geographic area. Section 1396a(a)(30)(A) of the Social Security Act, commonly referred to as the Medicaid "Equal Access Provision" requires that States:

> provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan (including, but not limited to utilization review plans as provided for in section 1903(i)(4) [42 USCS § 1396b(i)(4)]) as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area.

42 USCS § 1396a(30)(a).

21. Federal law also provides that states should administer Medicaid plans in the best interests of the recipients.

22. Specifically, 42 U.S.C. §1396a(a)(19) requires that States:

provide such safeguards as may be necessary to assure that eligibility for care and services under the plan will be determined, and such care and services will be provided, in a manner consistent with simplicity of administration and the best interests of the recipients

42 USCS § 1396a.

## Suspension of Medicaid Payments - 42 C. F. R. § 455.23

23.     Federal law also requires state agencies to prevent fraud and waste of Medicaid funds. Federal law calls for state Medicaid agencies to suspend Medicaid payments in instances where it has made a determination that there exists a *credible* allegation of fraud, except when good cause exists to not suspend such payments.
*See* 42 CFR 455.23(a)(1)(emphasis added).

24.     42 CFR 455.23(e), however, provides that state Medicaid agencies may not suspend Medicaid payments where good cause exists in situations where any of the following are applicable:

> (2) Other available remedies implemented by the State more effectively or quickly protect Medicaid funds;
> (3) The State determines, based upon the submission of written evidence by the individual or entity that is the subject of the payment suspension, that the suspension should be removed;
> (4) Beneficiary access to items or services would be jeopardized by a payment suspension because of either of the following:
> (i) An individual or entity is the sole community physician or the sole source of essential specialized services in a community.
> (ii) The individual or entity serves a large number of beneficiaries within a HRSA-designated medically underserved area.
> \*\*\*
> (6) The State determines that payment suspension is not in the best interest of the Medicaid program.

25.     The purpose of 42 C.F.R. § 455.23 is to ensure that state agencies suspend payments to providers who are submitting fraudulent claims such that Medicaid funds are not wrongly dissipated. 76 F.R. 5966, p. 5934.

26. The good cause exception is also intended to be construed broadly "to reflect that payment suspension is a very serious action that can potentially lead to dire consequences." 76 F.R. 5966, p. 5933.

27. In the FCA Litigation, there are no allegations that VTCC is currently submitting fraudulent claims. Thus, the intent of 42 C.F.R. § 455.23 is not implicated in this case, particularly in the absence of any risk to Medicaid funds, and when that fact is balanced against the suspension's resulting hardship on the Medicaid beneficiaries at issue here.

28. VTCC faces imminent, irreparable harm from DMAS' premature decision to suspend Medicaid payments for mental health services under VTCC's National Provider Identifier Number: 1811089014. If DMAS is not enjoined from suspending VTCC's ability to receive payment for its Medicaid based services, VTCC will be forced to lay off all of its employees and will be forced out of business. Moreover, VTCC's at-risk clients will also greatly suffer from having their mental health care provider abruptly disrupted mid-treatment. VTCC is likely to prevail on the merits of both the FCA Litigation filed in this matter, and the administrative appeal of DMAS' decision to suspend VTCC's Medicaid payments under 42 CFR 455.23.

29. Not only does the FCA Complaint, which falsely alleges fraud against VTCC, not state a valid claim for fraud under any legal theory pled, but there is good cause for payments to continue as contemplated by 42 CFR 455.23(e) or (f). Moreover, the balance of the equities supports the issuance of an injunction at this time. Finally, given that VTCC's primary work is providing behavioral health services to a medically underserved community in Northern Virginia, the public interest is well-served by VTCC's request for an injunction.

## FACTUAL BACKGROUND

30. VTCC is a provider of mental and behavioral health services that focuses on providing culturally, religiously, and linguistically competent services to the underserved racial and multicultural minorities in Northern Virginia.

31. VTCC primarily offers two types of mental and behavioral health therapies for its clients: Intensive In-Home services ("IIH") and Behavioral Therapy services ("BT").

32. VTCC provides IIH and BT services in the homes of its minor clients by various qualified practitioners employed by or who are independent contractors for VTCC.

33. These qualified practitioners provide the treatment services, treatment notes and other reports to VTCC for the purpose of billing Medicaid.

34. The nature of the treatments and therapies provided to VTCC clients–at-risk, minority minors–makes the work difficult at times, even though it is very rewarding.

35. Because VTCC serves primarily underserved, minority communities of lesser means, Medicaid is the primary source of payment VTCC receives for its services.

36. The rates set by Medicaid for the services VTCC provides are well below what normal, market-priced treatment rates would be.

37. These circumstances create a high rate of turnover for VTCC's qualified practitioners who administer the treatments to clients.

38. Because the services VTCC provides are performed by qualified practitioners off site and in the homes of VTCC clients, VTCC typically has no direct contact with the clients or the clients' families. As a result of the manner in which in-home services are provided, clients and their families often develop a close bond with the qualified practitioner assigned to treat the client.

39. VTCC maintains a policy of transparency and open doors to encourage and facilitate staff participation in quality assurance processes, in clients' rights enforcement, and in non-compliance mitigation.

40. In 2017, as part of their regular due diligence, VTCC's supervisors came across information that raised potential red flags related to services rendered in the recent past that had been billed under the Medicaid program.

41. VTCC took these potential red flags very seriously and immediately began to investigate and audit its records to determine whether any billing abnormalities existed or if the red flags were just overstated concerns.

42. Given the nature of how VTCC provides its services, in-home with minor clients, the auditing process took time to independently verify the information certain qualified practitioners had provided to VTCC for billing purposes.

43. In some cases, clients and their families were not cooperative with VTCC's investigation, and in other cases clients and their families mislead VTCC about various sessions and treatments, which delayed the process further.

44. Despite these setbacks, VTCC continued to diligently audit its records and was eventually able to determine that some billing issues potentially existed and a full audit of VTCC billing records was warranted.

45. VTCC then began the even more arduous process of auditing all of its billing records to ensure that it found any potential errors and corrected them.

46. It was from these internal audits, that VTCC was carefully conducting, that the Relator in the FCA Litigation became aware of the information that she misconstrued to file her *qui tam suit*.

47. The Relator's information was incomplete at the time she filed her *qui tam* suit as VTCC was in the process of the audit and it continued to audit its billing records for potential issues.

48. While VTCC was continuing to complete the full audit of its billing records for potential billing issues, The Commonwealth of Virginia issued a subpoena duces tecum prior to initiating the FCA Litigation, asking for most of VTCC's billing related records.

49. Included in the documents responsive to the subpoena requests were VTCC's reports related to VTCC's own audits that demonstrated potential billing issues VTCC was diligently working to resolve.

50. The Government used the reports and other documents provided to it by VTCC, which were prepared as part of VTCC's audit, to form the basis of their intervention action on behalf of the Relator in the FCA Litigation.

51. However, VTCC was never aware of any incorrect billing prior to its audit of its records. VTCC also actively worked to not only audit its records, once red flags became apparent, but also continued developing its quality assurance policies and procedures to better prevent improper billing from occurring in the future.

52. VTCC has worked in good faith to diligently uncover and correct any billing issues brought to its attention and has never participated knowingly in any incorrect billing.

53. VTCC has also implemented quality assurance policies and procedures designed to prevent incorrect billing and foster a corporate culture of honesty and integrity.

54. When the Government became aware that VTCC was continuing its own internal audit and was planning on working with Magellan to resolve any potential issues, they immediately demanded that VTCC stop such actions.

55. DMAS' suspension of VTCC's Medicaid payments is highly destructive to VTCC's business and is detrimental to VTCC's clients' welfare and well-being.

56. Prior to having its Medicaid payments suspended, VTCC served 115 clients, of which 98 had been diagnosed within the Autism Spectrum Disorder (ASD). These ASD clients require very structured, consistent, frequent, and intensive services based on specific treatment plans that are tailored to each client's individual needs and behavior profile.

57. All of VTCC's clients' treatments have already been seriously affected by the current Covid-19 crisis. Before the pandemic started, VTCC provided all of its services in-home and in-person, but after Virginia declared a state of emergency, VTCC was forced to implement a telehealth modality to protect clients and staff from infection.

58. VTCC clients don't respond well to their routines being disrupted, and this shift from in-home, in-person treatments to telehealth represented a major change that took more than a month to stabilize patient behavior, and for VTCC staff to make headway into the significant regression that took place in patient behavior. Regressions that in some cases are going to take several months to bring back to pre-Covid levels.

59. The admission process to IHH and BT programs for children with autism as established by Medicaid requires at least three to six weeks for the pre-authorization to be completed. VTCC clients are at risk of being without any services or support for up to 45 days in the midst of a pandemic that has seen all other support services for this population being either closed or canceled.

60. A change in providers, even if possible, will represent an additional, significant alteration and disruption in the routine and consistency so fundamental for VTCC clients to function. To make matters worse, VTCC clients that will be referred to other providers will not

be given any option to select a provider that is responsive not only to their child's needs, but also to their cultural, religious, and linguistic needs.

61. VTCC's specialization in providing culturally, religiously, and linguistically competent services to the underserved racial and ethnic minorities in Northern Virginia cannot be understated and is critically important to these clients' treatment.

62. Moreover, to be transferred to other providers and for their treatment to continue, VTCC clients are looking at a wait period of at least 30 days if not more. This delay in treatment will be significantly detrimental both behaviorally, and from a mental health perspective, in the midst of a total absence of other support services that have been canceled because of the pandemic. When a new provider commences services prior treatment gains are at risk of being completely lost.

63. VTCC's ability to continue serving its community of clients is critically threatened by this suspension of Medicaid payments. It effectively puts VTCC out of business as Medicaid is the only source of revenue for an agency, such as VTCC, that is providing services to the underserved population in the area. While VTCC does have contracts with counties and cities in Northern Virginia, it is a requirement that VTCC accepts Medicaid clients in order to perform under those contracts.

64. By suspending Medicaid payments, VTCC's only revenue source evaporates, and it cannot pay staff, or maintain its operations. In other words, without its Medicaid payment license, VTCC is not a viable operation and it will be forced to close. As a result of DMAS' decision, VTCC has been forced to furlough its 78 employees and its 6 independent contractors.

65. VTCC has also continually invested in costly electronic management systems that curtail any possibility of fraud and allow it better control in managing service documentation and billing processes.

66. DMAS' suspension of VTCC's Medicaid payments, however, will force VTCC into bankruptcy. VTCC has already been forced to suspend all services and to furlough staff. If the suspension is allowed to stand, VTCC will be forced to begin layoffs and the closure of its vitally important business.

## COUNT I: DECLARATORY JUDGMENT

67. VTCC incorporates the allegations set forth in paragraphs 1-66 as if fully alleged herein.

68. Prior to the Covid-19 virus, VTCC's services were performed by qualified practitioners in VTCC's clients' homes. These qualified practitioners do not have any managerial authority over VTCC.

69. VTCC uses information submitted to it by these qualified practitioners to bill the Medicaid program based on the requirements the Medicaid program sets forth.

70. VTCC has quality assurance processes and procedures in place to ensure that proper billing takes place under the Medicaid program.

71. It was VTCC's quality assurance process and procedures that first alerted VTCC to potential billing issues.

72. VTCC then began an investigation that turned into a full-scale audit of its Medicaid billing to ensure proper compliance with the Medicaid billing requirements.

73. As a result of its investigation, VTCC made corrections to not only its policies and procedures, but it also made changes to its support staff to ensure continuous compliance with Medicaid billing requirements.

74. The False Claims act requires a level of knowledge or scienter above that of mere negligence of fraudulent billing or reporting before liability can be found.

75. VTCC had no knowledge whatsoever of any alleged improper Medicaid billing before such billing was submitted to Magellan.

76. Medicaid providers can only be vicariously liable for the actions of their agents if they are aware of or are willfully blind to the fraudulent actions of such agents. *See United States v. S. Md. Home Health Servs.*, 95 F. Supp. 2d 465, 467-69 (D. Md. 2000) (citing *United States v. Domestic Industries, Inc.*, 32 F. Supp. 2d 855 (E.D.Va. 1999)).

77. VTCC cannot be vicariously liable for the acts of its non-managerial qualified practitioners because it had no knowledge of their actions and maintained and enforced strict policies and procedures to safeguard against such latent billing actions.

78. The FCA Litigation is based solely on the results of VTCC's efforts to investigate and correct potential billing issues caused by the latent acts of certain individuals who violated VTCC's policies and procedures.

79. Because both the facts and the law do not support the imputation of knowledge of potential incorrect billing by certain qualified practitioners to VTCC, legally, there is no credible allegation of fraud against VTCC.

80. A suspension of Medicaid payments under 42 C.F.R. § 455.23 requires a credible allegation of fraud against the Medicaid provider. As the paragraphs above demonstrate, there is no credible allegation of fraud against VTCC.

WHEREFORE, Victoria Transcultural Clinical Center, VTCC, LLC respectfully requests that this Court grant Victoria Transcultural Clinical Center, VTCC, LLC a declaratory judgment and enter an order declaring:

   a. On July 2, 2020, DMAS lacked the statutory authority to issue a suspension of VTCC's Medicaid payments;

   b. The suspensions issued against VTCC is invalid; and

   c. The DMAS issued suspension is reversed and the VTCC's Medicaid payments are immediately reinstated.

## COUNT II: INJUNCTIVE RELIEF FOR VIOLATION OF 42 C.F.R. § 455.23

81. VTCC incorporates the allegations set forth in paragraphs 1-66 as if fully alleged herein.

82. DMAS' suspension of VTCC's Medicaid payments violates 42 C.F.R. § 455.23 because (i) there have been no credible allegations of fraud; and (ii) good cause exists not to suspend payments.

*No Legal Basis to Make Determination that Credible Allegations of Fraud Exist*

83. The letter from Magellan does not set forth any factual basis for DMAS' determination that a credible allegation of fraud exists. Presumably then, DMAS is relying on the FCA Litigation as its basis for a credible allegation of fraud.

84. As set forth in Count I, however, no credible allegation of fraud exists in the FCA Litigation.

85. Therefore, DMAS lacks the legal basis for suspending VTCC's Medicaid payments and it has violated VTCC's rights under 42 C.F.R. § 455.23 and Section 1983 of the United States Code, which will cause VTCC irreparable harm.

*Good Cause to Continue Medicaid Payments Exists*

86. The Medicaid regulations establish that good cause to continue Medicaid payments exist where: (a) the provider serves a medically underserved area and (b) suspension would not be in the best interests of the Medicaid program. 42 C.F.R. §455.23(e).

87. The good cause exception is to be broadly and liberally construed to "reflect that the payment suspension is a very serious action that can potentially lead to dire consequences."

88. Good cause exists to continue VTCC's Medicaid payments because VTCC specializes in serving underserved populations in Northern Virginia and because suspension is not in the best interests of the Medicaid program.

VTCC Services Underserved Populations in Northern Virginia

89. VTCC specializes in providing culturally, religiously, and linguistically competent mental and behavioral health care services to the underserved racial and ethnic minorities in Northern Virginia.

90. Federal regulations state that a medically underserved area or population constitutes good cause for not suspending Medicaid payments.

91. Consequently, good cause exists to not suspend VTCC's Medicaid payments under 42 C.F.R. 455.23(e).

Suspension Is Not In the Best Interests Of The Medicaid Program

92. Good cause to continue VTCC's Medicaid payments exists because suspending VTCC's Medicaid payments is not in the best interest of the Medicaid program.

93. VTCC currently treats over 100 patients and the majority of those patients are high-risk, special needs patients. Their health, safety, and well-being is severely threatened by

the daunting task of finding new health care providers qualified to treat their special needs, as such patients do not respond well to the disruption in their routines.

94. Even if suitable alternatives to VTCC's care can be found, a change in providers will require at least three to six weeks for the services pre-authorization to be completed. VTCC clients are at risk of being without any services or support for up to 45 days in the midst of a pandemic that has seen all other support services for this population either being closed or canceled.

95. To make matters worse, VTCC clients that will be referred to other providers will not be given any option to select a provider that is responsive not only to their child's needs, but also to their cultural, religious, and linguistic needs.

96. VTCC's specialization in providing culturally, religiously, and linguistically competent services to the underserved racial and ethnic minorities in Northern Virginia cannot be understated and is critically important to these clients' treatment.

97. Moreover, to be transferred to other providers and for their treatment to continue, VTCC clients are looking at a wait period of at least 30 days if not more, which will be significantly detrimental both behaviorally and from a mental health perspective in the midst of a total absence of other support services that have been canceled because of the pandemic. Most treatment gains are at risk of being completely lost when a new provider starts treatment.

98. Accordingly, the suspension of VTCC's Medicaid payments is not in the best interest of the Medicaid program.

WHEREFORE, Victoria Transcultural Clinical Center, VTCC, LLC respectfully requests that this Court grant Victoria Transcultural Clinical Center, VTCC, LLC an injunction and:

a. Enter a temporary restraining order or preliminary injunction enjoining the suspension of VTCC's Medicaid payments and preserving the status quo as it existed before July 2, 2020, until such time as VTCC is afforded a full and fair administrative review of DMAS' decision to issue the suspension and VTCC receives a ruling following the hearing;

b. In the event the suspension is not overturned at the administrative hearing level, order the suspension stayed until such time as the patients currently receiving treatment at the Providers' facilities secure alternative care; and

c. Award VTCC any such further relief as the Court deems just and proper.

### COUNT III – VIOLATION OF DUE PROCESS
(Asserted for VTCC's Clients)

99. VTCC incorporates the allegations set forth in paragraphs 1-66 as if fully alleged herein.

100. VTCC's clients at issue in this action have a protected interest in continuing to receive Medicaid sponsored treatment and to have equal access to such treatment as provided for by Section 1396a(a)(30)(A) of the Medicaid Act.

101. VTCC's patients are also entitled to have the Medicaid program administered in the Medicaid beneficiaries' best interests as provided for by Section 1396a(a)(19).

102. DMAS' suspension at issue here will result in the immediate closure of VTCC's business. Because of the special needs and at-risk status of VTCC's clients, VTCC's closure will constitute a hardship on VTCC's clients that will in effect deny them their right to equal access to qualified Medicaid services in violation of Section 1396a(a)(30)(A).

103. Permitting this suspension to take place will unnecessarily force over 100 at-risk clients to abruptly change service providers, which will trigger anxiety and trauma, and put the clients' treatment progress at risk. Consequently, the suspension amounts to a denial of the

protections of Section 1396a(a)(19) granting Medicaid recipients the right to have the program administered in their best interests.

104. Because of the threat of harm to VTCC's clients that will result from this suspension, which violates the due process clause of the United States Constitution, the suspension must be set aside until a review of the merits is completed.

WHEREFORE, Victoria Transcultural Clinical Center, VTCC, LLC respectfully requests that this Court grant Victoria Transcultural Clinical Center, VTCC, LLC an injunction and:

    a. Enter a temporary restraining order or preliminary injunction enjoining the suspension of VTCC's Medicaid payments and preserving the status quo as it existed before July 2, 2020, until such time as VTCC is afforded a full and fair administrative review of DMAS' decision to issue the suspension and VTCC receives a ruling following the hearing;

    b. In the event the suspension is not overturned at the administrative hearing level, order the suspension stayed until such time as the patients currently receiving treatment at the Providers' facilities secure alternative care; and

    c. Award VTCC any such further relief as the Court deems just and proper.

Respectfully submitted,

**VICTORIA TRANSCULTURAL CLINICAL CENTER, VTCC, LLC,**

_____/s/ Jennifer A. Brust_____
Jennifer A. Brust, Esq. (Va. Bar No. 29707)
Samuel J. Banks, Esq. (Va. Bar No. 88990)
Bean, Kinney & Korman P.C.
2311 Wilson Boulevard, Suite 500
Arlington, VA 22201
Telephone: (703) 525-4000
Facsimile: (703) 525-2207
jbrust@beankinney.com
sbanks@beankinney.com
Counsel for Plaintiff